IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**ADIB EDDIE RAMEZ MAKDESSI,**

Petitioner,

v.

**BRYAN WATSON,**

Civil Action No. **3:09CV214**

Respondent.

## MEMORANDUM OPINION

Petitioner, a Virginia prisoner proceeding *pro se*, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a motion to dismiss, to which Petitioner has replied. This matter is ripe for judgment.

## I. BACKGROUND

Petitioner is currently serving two life sentences for first-degree murder for the May 14, 1996 killings of Elise Makdessi, his wife, and Quincy Brown, Elise's co-worker at Naval Air Station Oceana ("NAS Oceana"). Petitioner is also serving an additional thirteen years for two firearm crimes in conjunction with the incident. Petitioner has always maintained that Brown assaulted him and tied him up as Petitioner and Elise returned to their apartment from dinner, and that he shot Brown in self defense while Brown was raping and stabbing Elise. Petitioner claimed that Brown and other individuals sought to prevent Elise from reporting that NAS Oceana personnel had sexually harassed and raped her previously. The Commonwealth argued that Makdessi killed Elise to collect her two life insurance policies, fabricated evidence that Elise had been raped, and tampered with the crime scene.

The unusually complex background to Petitioner's conviction spans over ten years.

## A.    Events Prior to the Killings

At the time she was killed, Elise Makdessi and Petitioner had been married for approximately five years. Elise was stationed at Naval Air Station Oceana in Virginia Beach, Virginia, where she was being trained as an air traffic controller. In early 1996, Elise was transferred to an office job in the quarterdeck.

On April 9, 1996, Petitioner and Elise met with Attorneys Jack Ferebee and Josephine Clay. They sought advice about filing a complaint of sexual harassment and possible rape against the Navy, but would not give any specific details or names. Petitioner called Clay on April 14, 1996, and left a message asking if she would represent Elise. When Clay returned Petitioner's call the following day, the cellular phone was turned off. Petitioner and Elise did not speak with Clay or Ferebee again.

In April 1996, Petitioner and Elise each purchased a $500,000 life insurance policy naming the other as beneficiary. (Trial Tr. 1040-46.) Petitioner and Elise purchased an additional coverage agreement that covered them during the pendency of their application. Additionally, in May of 1996, Navy death benefits doubled from $100,000 to $200,000.

Sometime in mid-to-late April, the Makdessis stopped at the home of their friends Terry and Lisa Swafford. Petitioner told the Swaffords that they had received threatening telephone calls, and that the tires on their car had been slashed. Petitioner told the Swaffords that Elise had been having problems at work. Elise did not provide specifics or disclose the names of any co-workers, but led the Swaffords to believe that high ranking officers were involved. Petitioner told them that "this would be as big as Tailhook or bigger." (Pet. Ex. 15, at 2.)[1] Elise told the

---

[1] The Court has corrected any capitalization errors in Petitioner's submissions.

Swaffords that she had been transferred out of her previous position after filing a complaint at work. Lisa recommended that Elise make a videotape documenting her complaints. Petitioner informed Lisa that he and Elise had already contacted an attorney, who had advised them to get more evidence before taking any legal action.

On April 24, 1996, Petitioner and Elise met with Anne Hunter, a licensed professional counselor. Petitioner made the appointment in his own name, later explaining to Hunter that he wished to keep Elise's problems secret from the Navy. During the session, Petitioner stated that he and his wife had been drifting apart during the previous two months. Elise stated that she had been sexually harassed and, approximately three months prior to the appointment, raped by an officer in her command. Elise also reported that she and Petitioner had received threatening phone calls, and that the tires on their car had been slashed. Hunter determined that Petitioner and Elise showed signs of depression, and referred them to another doctor, who prescribed antidepressants for Elise. The Makdessis later cancelled a follow-up appointment.

Around May 3, 1996, Elise made a videotape alleging several incidents of sexual harassment and rape. Elise claimed that, approximately two months after her arrival at NAS Oceana, two men in a cafeteria on base taunted her about being married to an Arab and subsequently fondled her. She reported the incident to her section leader, who warned her that if she made a written report she would not prevail and would also be disciplined for making a false accusation. Later, in January of 1996, an unnamed petty officer second class came into a room she was cleaning and raped her. Elise tried to report the incident, but was told to keep quiet because her assailant had used a condom and she could not prove anything. Elise was then transferred away from her position in the control tower to a desk job answering phones in the

3

quarterdeck. Three weeks after her transfer, Elise was raped in the woman's bathroom by an unnamed male petty officer first class, who warned her that she and her husband could get hurt unless she kept quiet. Elise claimed that she had been collecting written reports of rape from other Navy women in similar circumstances, and that she would soon have enough evidence to send to the media. Elise stated that she had not identified any of her assailants because she feared Petitioner might take the law into his own hands.

Petitioner and Elise visited Elise's family on the weekend before Elise was killed. On Thursday, May 9, 1996, the Makdessis drove to Washington, D.C. to visit Elise's sisters. On Friday, May 10, the Makdessis flew to New England to visit the rest of her family. They returned at approximately 7 p.m. on Monday, May 13, 1996. At 8:16 p.m. that night, Elise bought a .38 caliber revolver. Petitioner was present at the purchase.

On May 14, 1996, Elise and Quincy Brown worked a twelve-hour shift together. Elise and Petitioner went out for dinner at Aldo's restaurant. During dinner, Elise made a long call on a pay phone.[2] Brown's cell phone records revealed that he had called the land-line telephone in the Makdessi apartment three times at approximately 9:35 P.M.[3]

## B.    Killings of Elise Makdessi and Quincy Brown

At 9:54 p.m. on May 14, 1996, emergency personnel were dispatched to Petitioner's residence in response to his 911 call. On arrival, officers from the Virginia Beach Police Department ("VBPD") found Petitioner walking down an external stairwell leading to the second

---

[2] Petitioner maintains that Elise never made a call at dinner.

[3] The first call connected, but lasted only four seconds. The second call occurred approximately twenty seconds after the first, and was not answered. The final call was connected and lasted two minutes and ten seconds. (Trial Tr. 1020-21, 1029.)

4

floor of the building. The officers found Elise bound to the bed. Elise was bleeding from two stab wounds to her torso, and her throat had been slashed. Quincy Brown had been shot in the chest and abdomen three times. Police pronounced Brown dead at the scene. Elise died on the way to the hospital. Autopsies revealed the presence of Brown's sperm in Elise's vagina.

Police found Brown lying on his back near the bed. Police recovered a bullet from the floor underneath Brown. Forensic investigator Elizabeth Dunton recovered a blood-covered knife under Brown's hand. The blood on the blade was primarily Elise's, while the blood on the handle belonged primarily to Brown. There was no sign of forcible entry into the apartment.

Police recovered electrical cords that had been cut from a videotape rewinder and a humidifier in the Makdessis' home. A roll of toilet paper recovered from the bathroom contained a smear of Brown's blood. A Luminol test of the bathroom sink indicated that blood was present in the sink, although none was visible to the naked eye. Brown's jacket was on a chair in the living room, an unused condom in the pocket. Brown's cellular phone was in his truck.

A paramedic treated Petitioner at the scene. Petitioner said that he had been struck in the head and could not remember what had happened, but had never lost consciousness. Petitioner was not suffering from any "gross obvious bleeding." (Trial Tr. 529.) Paramedics took Makdessi to the hospital. Petitioner told Dr. Harry Lustig that someone struck him on the head as he entered his home, knocking him unconscious. Lustig's examination revealed a small bruise on the right side of Petitioner's scalp.

## C.    Events Occurring Between the Murder and Petitioner's Indictment

Petitioner was not immediately charged in connection with the deaths of Elise and Brown, in part because a VBPD forensic investigator concluded that the crime scene was

consistent with Petitioner's version of events. Accordingly, the Navy paid Elise's death benefits and New York Life Insurance paid Elise's policy in 1996. A Naval Criminal Investigative Service investigator later recommended to the VBPD that they contact Ross Gardner, a blood spatter analyst for the Army's Criminal Investigation Division. In August of 1998, Gardner filed a preliminary report explaining that the crime scene was not consistent with Petitioner's version of events.

In the meantime, Petitioner left Virginia Beach and returned to Massachusetts to be near his parents. On August 25, 1996, Petitioner called the police in Massachusetts and claimed that gunmen had run his car off the road, set it on fire, and shot Petitioner. The gunmen told Petitioner that he should have kept his mouth shut.[4] Police were reportedly skeptical because, although there were wounds in Petitioner's stomach, his skin had not been penetrated by a bullet.

On September 14, 1996, Petitioner called police reporting that he had just been kidnaped, shot and left for dead by two or three individuals. Petitioner claimed that the individuals forced him into the back of his truck, drove him to a remote location, shot him twice, and then drove away in a car waiting at the scene. Petitioner was unhurt, however, because he was wearing a bulletproof vest at the time. Petitioner's truck was somehow[5] sent over the edge of a cliff, where it landed approximately 100 feet below. Petitioner jumped out of his truck, clutching his cellular phone, and called police. According to the Commonwealth, Massachusetts police found evidence that the incident was staged. Petitioner was charged with making a false report in connection with this incident. (Pet. Ex. 19.)

---

[4] Descriptions of the events are taken from the Commonwealth's proffers at hearings on September 28, 2004, and January 12, 2005.

[5] It is unclear whether Petitioner claimed that the gunmen ran his truck off the cliff while he was driving or that the truck was already partly off the cliff and fell when Petitioner entered it.

In December of 1996, Petitioner left the United States to visit his grandmother in Syria. He returned on January 7, 1997. Near the end of February 1997, Petitioner was deported to Syria. Approximately eighteen months later, Petitioner met a Russian woman whom he married one month later. They lived in Lebanon together for a year before moving to Moscow.

On March 30, 2001, Petitioner called Nancy Perry, Elise's aunt. According to Ms. Perry, Petitioner told her about his new family and informed her that he had a daughter. Petitioner also told her that he had written the story of the events surrounding Elise's death and sent it to several newspapers in the United States, who had not published it. Ms. Perry asked for a copy, which Petitioner sent to her the next day.[6] That story was captioned "The Unbeleivable [sic] True Story." The document purported to relate Petitioner's version of the cover-up surrounding his wife's death. The document claims that three men were involved in the attack - one was holding Elise down, one was tying her up, and one was raping her. The document also contained a claim that an unidentified Navy officer contacted Petitioner telling him that Admiral Jeremy Boorda had not committed suicide. The Navy officer claimed that Admiral Boorda had been shot twice in the chest because he was "going to make a statment [sic] and speak to the media about every thing [Elise] and all the females" had experienced, and that the attacks could have been committed by "the other two persons involved in the attack on [Petitioner's] wife." (Pet. Ex. 6, at 3-4.) Ms. Perry contacted the VBPD shortly after receiving this e-mail.

On May 7, 2001, a grand jury indicted Petitioner on two counts of first degree murder, one count of using a firearm in commission of a felony, and one count of maliciously discharging

---

[6] Although Petitioner now claims that the document is fraudulent, Petitioner stipulated at trial that he e-mailed Ms. Perry a copy of the story the day after he told Ms. Perry that he would do so.

a firearm in an occupied building. Petitioner subsequently learned from Mike Mather, a reporter who had covered the killings, that he had been indicted. On August 19, 2003, Makdessi voluntarily returned to the United States, where he was immediately arrested.

## II. PROCEDURAL HISTORY

### A.    Pretrial Events

Although Petitioner was arrested upon his return from Russia on August 19, 2003, Petitioner's trial did not begin until March 6, 2006. Because some of Petitioner's claims relate to pretrial issues, the relevant events are recounted here.

### 1.    September 28, 2004 Hearing - Motions *In Limine* on the Admissibility of the Videotape and the Massachusetts Evidence; the Prosecution's Improper Contact with Witnesses; Withdrawal of Motions to Dismiss and to Quash

Petitioner was initially represented by public defenders Peter Legler and Annette Miller. On September 28, 2004, Legler and Miller ("the public defenders") appeared at a hearing at which Petitioner was not present.[7] At this hearing, the parties argued motions *in limine* regarding the videotape and the Massachusetts evidence. The parties both argued that their evidence was independently admissible; nevertheless, they also agreed with the Circuit Court that the admission of either party's evidence would make the other's admissible in rebuttal. The Circuit Court, considering the all-or-nothing nature of admissibility in this case, remarked that admitting all of the evidence would result in a mini-trial on collateral matters that would "look like a circus" (Sept. 28, 2004 Tr. 28) and could "make the Scott Peterson trial look simple" (Sept. 28, 2004 Tr. 31). Legler advocated that all of the evidence be kept out, explaining that the inclusion

---

[7] At the various hearings in this case, the public defenders often have argued together on the same issue. For the sake of convenience, they are referred to jointly in this opinion.

of the Massachusetts evidence would make the charges "[u]nbelievably difficult for this defendant to defend against" because Petitioner would effectively be on trial for two sets of crimes. (Sept. 28, 2004 Tr. 35.) The Court ruled that neither evidence would be admitted at trial.

The Commonwealth's Attorneys also admitted at this hearing that they had sent many witnesses copies of their 1996 witness statements. The public defenders argued that the Commonwealth was attempting to circumvent Virginia's bar on the admission of a prior statement that had not been verified while the events were still fresh in the mind of the witness. As a remedial measure, the Circuit Court ordered reciprocal discovery of all witness statements. The public defenders also withdrew the motions to dismiss and quash the indictments because "there would be no point in proceeding." (Sept. 28, 2004 Tr. 2.)

**2.     Hearings of November 1, 2004, November 22, 2004, and November 29, 2004 - Petitioner's Motions to Substitute Counsel and to Proceed *Pro Se***

On November 1, 2004, the Circuit Court held a hearing to address Petitioner's motion to substitute counsel. Petitioner, who had filed a bar complaint against the public defenders, explained that they refused to send him copies of discovery or keep him informed of court dates, and would not communicate adequately during visits to jail, which occurred only every four months or so. Petitioner also challenged counsel's decision to withdraw the motion to dismiss, and their disregard of his order to admit the videotape at all costs. The public defenders opposed the motion, explaining that they had invested hundreds of hours in Petitioner's case and had visited him at least fourteen times, with only one session lasting less than half an hour. They also explained that, in their opinion, the motion to dismiss would not have been granted. The Circuit Court denied Petitioner's motion.

At a hearing on November 22, 2004, Petitioner made a motion to proceed *pro se*. The Commonwealth's Attorney argued strenuously against the motion. After warning Petitioner of the dangers of self-representation, the Circuit Court scheduled a second hearing for November 29, 2004.

### 3. Period of *Pro Se* Representation: November 29, 2004 to January 19, 2005

At the hearing of November 29, 2004, the Circuit Court granted Petitioner's motion to proceed *pro se*. The Circuit Court denied Petitioner's request to appoint different attorneys as standby counsel. Petitioner then asked the Court to confirm his understanding that he could enter the videotape into evidence under certain circumstances. The Circuit Court declined to do so, stating instead that its earlier ruling was still in effect and would control.

At a motions hearing on January 4, 2005, Petitioner asked the Circuit Court to enter an order increasing his access to the law library. Petitioner explained that he was unable to effectively represent himself because Virginia Beach Correctional Center ("the Jail") did not have a law library. An employee of the Virginia Beach Sheriff's Department explained the procedure used at the Jail:

> Sir, when an inmate needs legal materials, they are to write a correspondence form to our librarian. . . . If the information is not available on the internet, [the librarian] then goes over to the Wahab law library, obtains the material, makes copies of it, and delivers it to the inmate. . . . [The librarian] works thirty-six hours a week. I'm guessing that it would take probably less than seven days to get the material to the inmate.

(Jan. 4, 2005 Tr. 3-4.) Petitioner claimed that this procedure unfairly forced him to divulge his trial strategy to the Commonwealth. The Circuit Court extracted a promise from the

Commonwealth that no one had spoken with the librarian to discover what cases were requested, and that no one would do so in the future.

Petitioner also argued that the Jail was violating his rights by not providing any legal materials unless Petitioner provided the proper citations. Petitioner also provided evidence that the librarian gave him law from the United Kingdom in response to his request for information on the hearsay rule. The Court explained that Petitioner should "ask him for different periodicals for specific cases," and that he would not be allowed to visit the law library. (January 4, 2005 Tr. 7.) The Court ordered Petitioner to follow the Jail's existing procedures.

Petitioner then complained that the public defenders had not provided him with all of the relevant information in his case, including expert witness names. They responded that they had given him all of the discovery provided by the Commonwealth, and that Petitioner had not provided a list of experts he desired to use. Petitioner also complained that the public defenders had not responded to his requests for a visit at the jail. Ms. Miller responded that Petitioner had not actually requested help preparing his case. Instead, he had asked her to "come over and explain [her] past decisions," which was not an appropriate reason to meet with Petitioner as standby counsel. (Jan. 4, 2005 Tr. 15.)

At a hearing on January 12, 2005, Petitioner moved the Court to reverse its earlier ruling and allow both the bad acts evidence and videotape to be admitted into evidence. Petitioner argued that the videotape was admissible as an exception to the hearsay rule because it was a dying declaration, an excited utterance, and an assertion of Elise's state of mind. The Court again ruled that the videotapes were not admissible, and that the bad acts evidence was not admissible in the Commonwealth's case in chief. After Petitioner observed that self-

representation was "way too much for me" (Jan 12, 2005 Tr. 22), Mr. Legler agreed that they could explore the possibility of resuming their representation of Petitioner. At a status hearing on January 15, 2005, Mr. Legler and Ms. Miller informed the court that they were once again representing Petitioner.

### 4. Second Period of Representation by the Public Defenders

Petitioner's dissatisfaction with the public defenders continued. At a hearing on March 7, 2005, Petitioner requested the appointment of new counsel. Petitioner explained that the public defenders were urging him to attempt to reach a plea agreement, and that Petitioner believed the public defenders had decided that he was guilty. The Court explained that Petitioner had only two choices: to represent himself, or to accept representation by the public defenders. At a hearing on March 16, 2005, Petitioner again moved for the Circuit Court to appoint new attorneys. The Circuit Court refused to do so, and because Petitioner would not waive his right to counsel, the public defenders continued to represent him.

### 5. Withdrawal of Public Defenders and Appointment of Thomas Reed

On January 3, 2006, the Circuit Court granted the motion of the public defenders to withdraw, and appointed Thomas Reed to represent Petitioner at trial. (Jan. 3, 2006 Tr. 2-3.) The public defenders office later explained that they moved to withdraw "after the Commonwealth decided to utilize current and former public defender clients as 'snitches' in its case." (Oct. 7, 2008 Letter, Respt.'s Ex. A., Record No. 081529 (Sup. Ct. Va.).)

## B. Trial and Conviction

Petitioner's trial began on March 6, 2006, and ended with his sentencing on March 16, 2006. The Commonwealth presented 51 witnesses. Petitioner testified in his own defense, but

produced no other witnesses. An overview of the events of trial will help the reader comprehend the volume and persuasive power of the evidence presented against Petitioner.

### 1. Evidence from Co-workers, Acquaintances, and Family of the Makdessis

Many of Elise's co-workers testified that Elise lacked practical skills, and that she had been transferred in order to prevent her from logging too many training hours and washing out of the program. They also testified that they would have reported any sexual harassment pursuant to the Navy's policy if they had been aware that any had occurred.

Various friends and family testified to the unusual relationship between Elise and Petitioner. According to them, Petitioner discussed having extramarital affairs. Robert Mentzer testified that Petitioner kept in his wallet a list of phone numbers of exotic dancers, and bragged about it in Elise's presence. Several witnesses testified that Petitioner mentioned making or attempted to show them homemade pornography (featuring Elise and others) and other sexually explicit material, sometimes in Elise's presence. Neighbors testified that the Makdessis argued loudly enough to be heard from adjacent apartments. Witnesses also testified that Petitioner believed Elise was having extramarital affairs, and was an angry and jealous husband who insisted on keeping track of Elise's whereabouts and driving her everywhere. Daniel Timboe, a friend, testified that he and Petitioner had once gone on a double date with their wives. Upon arriving at the Makdessis' apartment that evening, Timboe was surprised to discover that Petitioner had hired strippers to perform at his house before they left for the evening.

Alex Crosby, Elise's brother, testified that Petitioner had urged Elise to discuss her work-related troubles during their visit the weekend before the killings. Elise, however, did not do so.

Kevin Heaney, a claims director at New York Life Insurance Company, reported that Petitioner called him almost daily for approximately three months from June 1996, when

13

Petitioner submitted his claim, until the claim was paid. Daniel Timboe, a friend, testified that Petitioner had once asked him to rear-end Petitioner's car as part of an insurance fraud scheme. Several witnesses testified that Petitioner had a large collection of guns and hunting knives.

### 2. Testimony Regarding Inconsistencies in Petitioner's Versions of the Killings

Detective Paul Yoakam interviewed Petitioner on the night of the killings. Petitioner explained that he had called Robert Mentzer from Aldo's restaurant on his cellular phone, but neither he nor Elise made any other telephone calls at the restaurant. Petitioner told Yoakam that a single man assaulted him from behind as Petitioner was trying to close his front door. Petitioner woke up on the bedroom floor and saw a man raping and stabbing his wife. Petitioner reported that his hands were bound when he awoke, and that Elise used her assailant's full name as she begged for mercy. As Petitioner reached the bedside table and retrieved his gun, the man leapt from the bed and Petitioner shot him from a standing position. The assailant fell to his knees, moaning. Petitioner walked around the bed, attending to Elise. As Petitioner walked to the telephone, the assailant lunged at him. After a brief struggle in which the assailant nicked Petitioner on the hand with his knife, Petitioner shot the assailant once or twice more. Petitioner then called 911 on his cordless phone. Petitioner, in a state of shock, looked around for a compress and picked up a roll of toilet paper from the bathroom, but decided that it would not serve. According to Petitioner, the assailant was a black man whom he did not recognize. During a subsequent interview, Petitioner claimed that he was struck in the head twice as he was disarming his alarm system, and that he was on his knees when he shot the assailant.

Dr. Harry Lustig, who treated Petitioner at the hospital on the night of the killings, testified that Petitioner told him that he obtained the gun from his closet, not the bedside table.

14

Restaurant staff testified that Elise made two telephone calls from Aldo's the night of her death, the second of which lasted approximately forty minutes. Mentzer also testified that, on the night of the killings, Petitioner called him on his cellular phone from Aldo's, and told him that Elise was on a pay phone at the time.

Dawn Crosby testified that Petitioner initially told her that there may have been two individuals, and that the sliding glass door to their balcony was open. Alex Crosby and Nancy Perry testified that Petitioner first told them that there was one assailant, but later added a second.

Timothy Gurley, with whom Petitioner had been incarcerated at the Jail, testified that Petitioner admitted to killing his wife, but claimed that Elise and Brown were having sex when he entered the house, and that he shot Brown and stabbed Elise. Gurley also testified that Petitioner claimed to have stabbed another man at the scene.

### 3. Forensic Testimony

Dr. Leah Bush performed autopsies on Elise and Brown. She testified that three of Elise's wounds were consistent with a knife whose edge was pointing towards Elise's head, not her feet. Elise showed no signs of genital trauma. Michael Grimm, Forensic Science Supervisor of the Virginia Department of Forensic Science, testified that bloodstains on Petitioner's pants were consistent with him having wiped the knife on his pants and that some of the stains were diluted, which could indicate that Petitioner had attempted to obliterate the stains.

Ross Gardner provided the most important forensic testimony. At the time of the trial, Gardner was an independent consultant in bloodstain pattern crime scene analysis. Gardner had amassed many credentials in his 29-year career, and attended over 1,000 hours of specialized bloodstain pattern analysis training. Gardner sent the Virginia Police a preliminary report in August of 1998 and completed a final report in August 2000.

Gardner's analysis of the crime scene contradicted nearly every aspect of Petitioner's version of the killings. Gardner testified that Brown was on his knees when he was first shot. He testified that the second shot was fired when Brown was either falling or standing. Gardner concluded that Brown was lying on the ground when the final shot occurred. He also testified that the shots could not have originated from where Petitioner claimed to have been standing.

Gardner also testified regarding blood patterns found on and made by the knife. He pointed out that stains on Petitioner's pants were inconsistent with a struggle with Brown. Moreover, diluted bloodstains on Petitioner's pants indicated that the hilt of the knife had been washed. Gardner testified that Brown's hands were covered with his own blood, not with Elise's. The hilt of the knife, however, had a mixture of blood from both Elise and Brown, further indicating tampering. Spattering on the knife was inconsistent with Brown having wielded it when he was shot, but consistent with Petitioner holding it. Gardner concluded that there was no evidence that Brown was ever in possession of the knife.

Other blood patterns on the comforter were inconsistent with Brown's presence on top of Elise because the blood had not pooled towards the area where Petitioner claimed Brown had been. Finally, Gardner concluded that there was no evidence of blood flow from Petitioner near the area where he claimed to have woken up after the alleged assault.

### 4.    Petitioner's Testimony

Petitioner repeatedly brought up Elise's alleged complaints of sexual assault, resulting in objections from the Commonwealth as to hearsay, which were sustained. He claimed never to have discussed the possibility that Elise was having an affair with anyone. According to him, he and Elise had a very happy marriage, and she frequently drove herself to work. He denied

16

approaching Timboe about any insurance fraud scheme, and claimed that it was Timboe's idea to have strippers over to Petitioner's house before the dinner date.

Petitioner claimed that, on the night of the killings, he was attacked from behind while disarming the alarm at his apartment and knocked out. When he awoke, he was bound and his eyes refused to focus. As he struggled to free himself, he heard Elise arguing with two men. One of the men was telling Elise that "I want all the copies of the charges. You f-ing bitch. You shouldn't have done that. We told you, we warned you to leave it alone. I want all copies of the videotapes you made. I want all copies of affidavits and --." (Trial Tr. 1500.) Elise told her attackers that there were six envelopes in the closet. Petitioner heard someone go to the closet, take something out, and leave. Petitioner then heard a struggle between Elise and her assailant.

Petitioner's eyes cleared shortly thereafter. He saw Brown raping Elise while asking why she had filed charges against him, and telling her she should have left it alone. Petitioner freed himself, crawled to the nightstand, opened the drawer, and took the gun inside. Brown noticed Petitioner as he stood. Brown charged at Petitioner, nearly tripping because he was pulling up his shorts. Petitioner shot Brown once, and thought he heard someone run out the door after the shot. When Petitioner shot him, Brown was "sort of kneeling, pulling up his shorts, and then he dropped down on his knees when I shot him." (Trail Tr. 1511.) Petitioner walked around the bed, attempting to untie Elise's bindings, but was unable. When he walked around to the other side of the bed, Brown sprung up and lunged at him, knife still in hand. Petitioner grabbed Brown's right hand, which held the knife, and Brown grabbed Petitioner's right hand, which held the gun. Petitioner broke free and shot Brown twice more.

Petitioner called 911 on his cordless phone. While on the phone, he began to feel sick, and flushed the toilet because he thought he was about to vomit. Petitioner saw in the bathroom

17

mirror that he was bleeding from a head wound, and put some toilet paper on the wound to staunch the flow of blood. On cross-examination, Petitioner first stated that he had tried to put his hands on Elise's wounds. However, he later testified that he had not put his hands on her chest wounds, and did not remember if he had put his hands on her neck.

Petitioner claimed that during the initial interview, Detective Yoakam told him that the police did not find a second attacker, and that Petitioner would be arrested and held if he kept saying that anyone else was present. Yoakam told Petitioner to simply answer the questions asked of him. Petitioner denied ever telling Gurley that he had killed Elise.

The following exchange between Petitioner and the Commonwealth's attorney occurred regarding the story sent to Nancy Perry:

> Q: Well, what about this unbelievable true story that you sent to Nancy Perry and the newspapers?
> A: That's not the first that I wrote . . . . There was another story I wrote there was five people . . . . I've lost a lot of sleep having nightmares. . . . And when I wake up, I believe what I saw in that nightmare. So that nightmare would say I saw five people. Then I go on the whole entire day thinking that there was five . . . . people's names on the list --
> Q: All right. All right. . . .
> . . . .
> Q: Did you write the unbelievable true story? Did you write this, the e-mail that was sent to Nancy Perry?
> A: I'm not sure if I wrote that.
> Q: You don't remember?
> A: No.
> Q: So if it says my name is Eddie Makdessi and I was born in Lebanon, Beirut, you don't know if you wrote that?
> A: Well, I can type a paper with your name on it and say you wrote it. It doesn't mean that you wrote it, does it?

(Trial Tr. 1584-86.)

The jury found Petitioner guilty on all counts. On March 16, 2006, the Circuit Court sentenced Petitioner to two life sentences plus thirteen years.

## C.    Appellate Proceedings

On appeal, Petitioner raised the following claims:

Claim One:    The Circuit Court violated Petitioner's rights under *Chambers*[8] by applying the hearsay rule to exclude Elise's videotape and affidavit.

Claim Two:    The Circuit Court violated Petitioner's right to access the courts by denying him meaningful access to a law library.

Claim Three:  The Circuit Court erred in not allowing Petitioner to testify as to Elise Makdessi's complaints of sexual mistreatment.

Petition for Appeal, *Makdessi v. Commonwealth*, Record No. 0898-06-1, at 17 (Va. App. July 28, 2006) (hereinafter "App. Pet."). The Court of Appeals of Virginia affirmed Petitioner's conviction, finding Claims One and Two barred because they had not been properly raised at trial. *Makdessi v. Commonwealth*, Record No. 0898-06-1, at 8-12 (Va. App. Dec. 6, 2006) (hereinafter "App. Ct. Op."). Claim Three was dismissed without consideration because the petition for appeal did not contain any argument or citation to authority in support. *Id.* at 12.

Petitioner, by counsel, filed a petition for rehearing by a three-judge panel. The petition was granted and, after oral argument, the panel denied Petitioner's claims. *Makdessi v. Commonwealth*, Record No. 0898-06-1, at 3 (Va. App. Apr. 6, 2007). The Supreme Court of Virginia refused to hear Petitioner's appeal. Order, *Makdessi v. Commonwealth*, Record No. 0898-06-1 (Va. Sept. 10, 2007). On November 9, 2007, the Supreme Court denied the subsequent petition for rehearing. Order, *Makdessi v. Commonwealth*, Record No. 0898-06-1, at 3 (Va. Nov. 9, 2007).

---

[8] *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (finding a due process violation where lower court "mechanistically" applied hearsay rule to exclude evidence of later-repudiated confessions that bore substantial indicia of reliability).

## D. State Habeas Proceedings

On August 7, 2008, Petitioner filed a petition for a writ of habeas corpus in the Supreme Court of Virginia. Petitioner raised the following claims for relief:

Claim A:  (1)  Trial counsel Legler and Miller rendered ineffective assistance by:
- (a) allowing the court to continue the trial date;
- (b) failing to adequately communicate for fifteen months; and,
- (c) failing to be present at a March 8, 2004 hearing regarding the Commonwealth's attempt to subpoena the records of reporter Mike Mather.

(2)  Trial counsel Thomas Reed rendered ineffective assistance by:
- (a) failing to make an adequate investigation into his case;
- (b) failing to make any motions to admit evidence;
- (c) failing to adequately meet with Petitioner;
- (d) lying about his failure to subpoena witnesses;
- (e) failing to elicit from Robert Mentzer during cross examination that Mentzer was granted immunity from prosecution for Elise's death in return for his testimony;
- (f) failing to object to perjury and evidence tampering by Elizabeth Dunton;
- (g) failing to prove that, due to perjury regarding where Petitioner's wife was laid for treatment, the blood spatter expert, R. Gardner, incorrectly testified as to Petitioner's lack of wounds;
- (h) failing to object to the admission of the fraudulent "unbelievable true story" through Nancy Perry; and,
- (i) failing to object, during closing argument, to the prosecutor's statement that Elise had been shot.

Claim B:  The Prosecutor committed misconduct by:
- (1) allowing perjurious testimony from:
  - (a) Elizabeth Dunton;
  - (b) Ross Gardner; and,
  - (c) Nancy Perry.
- (2) falsely stating during closing argument that Elise had been shot.

Claim C:  The trial court violated Petitioner's right to proceed *pro se* under *Faretta v. California*, 422 U.S. 806 (1975).

Claim D:  The trial court violated Petitioner's rights under *Chambers* by refusing to allow Petitioner to introduce hearsay evidence that Elise had been sexually assaulted and feared for her life.

| | | |
|---|---|---|
| Claim E: | Petitioner's right to access the courts was violated by the lack of access to the law library and materials. | |

| | | |
|---|---|---|
| Claim F: | The Circuit Court violated Petitioner's right to testify by refusing to allow him to testify as to his wife's statements that she had been sexually assaulted. | |

| | | |
|---|---|---|
| Claim G: | Reed violated Petitioner's right to obtain witnesses in his favor by failing to subpoena nine witnesses requested by Petitioner. | |

| | | |
|---|---|---|
| Claim H: | Petitioner's constitutional right to a speedy trial was violated. | |

Claim I:     Appellate counsel rendered ineffective assistance by failing to claim that:
(1)     trial counsel rendered ineffective assistance;
(2)     the Commonwealth's Attorneys committed misconduct;
(3)     Petitioner's conviction was obtained by use of the fraudulent confession contained in the "unbelievable true story";
(4)     Petitioner's right to obtain witnesses was violated;
(5)     Petitioner's constitutional right to a speedy trial was violated; and,
(6)     the Prosecutor violated Petitioner's *Brady* [9] rights.

Petition, *Makdessi v. Warden of the Wallens Ridge State Prison*, No. 081529 (Va. Aug. 7, 2008)

(hereinafter "State Hab. Pet."). The Supreme Court of Virginia dismissed the petition on March

16, 2009. *Makdessi v. Warden of the Wallens Ridge State Prison*, No. 081529 (Va. Mar. 16,

2009) (hereinafter "State Hab. Op."). The Supreme Court of Virginia found that Petitioner's

claims of ineffective assistance of counsel lacked merit, and that the remaining claims were

barred by Petitioner's failure to properly raise them at trial or on appeal.

**E.      Claims Raised in the Federal Habeas Petition**

Petitioner advances the following claims for relief:

Claim 1:     (A)     Trial counsel Legler and Miller rendered ineffective assistance by:
(i)      allowing the court to continue his trial date;
(ii)     failing to adequately communicate for fifteen months; and,

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

<table>
<tr><td></td><td>(iii)</td><td>failing to be present at a March 8, 2004 hearing regarding the Commonwealth's attempt to subpoena the records of reporter Mike Mather.</td></tr>
</table>

     (B)    Trial counsel Thomas Reed rendered ineffective assistance by:

          (i)     failing to make an adequate investigation into his case;

          (ii)    failing to make any motions to admit evidence;

          (iii)   failing to adequately meet with Petitioner;

          (iv)   failing to subpoena six witnesses requested by Petitioner;

          (v)    misrepresenting that he had subpoenaed the six witnesses;

          (vi)   failing to elicit from Robert Mentzer during cross examination that Mentzer was granted immunity from prosecution in return for his testimony;

          (vii)  failing to object to perjury and evidence tampering by Elizabeth Dunton;

          (viii) failing to prove that, due to the perjury regarding where Petitioner's wife was laid for treatment, the blood spatter expert, R. Gardner, incorrectly testified as to Petitioner's lack of wounds;

          (ix)   failing to object to the admission of the fraudulent "unbelievable true story" through Nancy Perry; and,

          (x )   failing to object, during closing argument, to the prosecutor's statement that Elise had been shot.

**Claim 2:**    The Prosecutor committed misconduct by:

     (A)    Allowing perjurious testimony from:

          (i)     Elizabeth Dunton;

          (ii)    Ross Gardner; and,

          (iii)   Nancy Perry.

     (B)    Falsely stating during closing argument that Elise had been shot.

**Claim 3:**    Petitioner's right to proceed *pro se* under *Faretta*, was violated because:

     (A)    Petitioner was not provided access to a law library;

     (B)    at a hearing on January 12, 2005, the Circuit Court "cut him off," preventing him from proffering the contents of the videotape and corroborating witness statements.

**Claim 4:**    The trial court violated Petitioner's rights under *Chambers* by refusing to allow Petitioner to introduce hearsay evidence that Elise had been sexually assaulted and feared for her life.

**Claim 5:**    Petitioner's right to proceed *pro se* under *Faretta* was violated when he was denied access to the law library and materials.

| Claim 6: | The Circuit Court violated Petitioner's rights by refusing to allow him to testify as to his wife's statements that she had been sexually assaulted. |
|---|---|
| Claim 7: | Reed violated Petitioner's right to obtain witnesses in his favor by failing to subpoena nine witnesses requested by Petitioner. |
| Claim 8: | Petitioner's constitutional right to a speedy trial was violated by the 57-month delay between indictment and conviction. |

Claim 9:     Appellate counsel rendered ineffective assistance by:
(A)     failing to claim that:
    (i)     trial counsel rendered ineffective assistance;
    (ii)     the Commonwealth's Attorneys committed misconduct;
    (iii)     Petitioner's conviction was obtained by use of the fraudulent confession contained in the "unbelievable true story";
    (iv)     Petitioner's right to obtain witnesses was violated;
    (v)     Petitioner's constitutional right to a speedy trial was violated; and,
    (vi)     The Prosecutor violated Petitioner's *Brady* rights.
(B)     failing to inform Petitioner for five months that the Supreme Court of Virginia had denied his petition for rehearing, causing him to forfeit his right to file a petition for certiorari and lose time to work on his state habeas petition.

| Claim 10: | The Commonwealth's Attorney tampered with approximately forty (40) witnesses by mailing to them their statements taken in 1996, immediately after the crime. |
|---|---|

(Pet. 6-21.) Respondent contends that Petitioner's claims are all either procedurally defaulted or without merit.

## III. EXHAUSTION AND PROCEDURAL DEFAULT

"In the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (*citing Matthews v. Evatt*, 105 F.3d 907, 910–11 (4th Cir. 1997)). "To satisfy the exhaustion requirement, a habeas petitioner must fairly present his

claim to the state's highest court." *Matthews*, 105 F.3d at 911 (*citing Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994)). Fair presentation demands that "both the operative facts and the controlling legal principles must be presented to the state court." *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) (*quoting Matthews*, 105 F.3d at 911); *see Gray v. Netherland*, 99 F.3d 158, 162-64 (4th Cir. 1996). To exhaust a federal claim, petitioners must alert state courts to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (*quoting Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)). Thus, "the presentation to the state court of a state law claim that is similar to a federal claim does not exhaust the federal claim." *Baker*, 220 F.3d at 289 (*citing Duncan*, 513 U.S. at 366).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard*, 134 F.3d at 619. "If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (*citing Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). Procedural default also occurs when a "petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (*quoting Coleman*, 501 U.S. at 735 n.1). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, this Court is precluded from reviewing the merits of a defaulted claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

## A.     Claims Improperly Presented on Direct Appeal

Petitioner raised Claim 4 on direct appeal, arguing that the Circuit Court violated his due process rights "[b]y mechanistically applying the hearsay rule to exclude the videotape and the

affidavit," thereby "subvert[ing] [Petitioner]'s entire defense in violation of his right to due process under the Fourteenth Amendment to the Constitution." App. Pet. at 20. The Court of Appeals of Virginia found this claim barred by Virginia Supreme Court Rule 5A:18 because Petitioner failed to "preserve his constitutional argument with a specific, contemporaneous objection that his due process rights to a fair trial were violated." App. Ct. Op. at 6. Rule 5A:18 constitutes an adequate and independent ground for denying a claim. *See Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000). The decision of the Court of Appeals of Virginia bars Petitioner's claims unless Petitioner can establish cause for failing to raise it at trial.

Petitioner argues that he personally objected repeatedly to the exclusion of the videotape evidence. (Petr. Opp'n Mot. to Dismiss 5 (*citing* Nov. 1, 2004 Tr. 7).) Nevertheless, the Court of Appeals of Virginia correctly determined that "the entire record indicates [Petitioner] never raised a constitutional argument on any grounds." App. Ct. Op. 6. Petitioner does not argue that any other facts establish cause for his failure to raise the claim below. Claim 4 will be DISMISSED.

In the interest of judicial economy, the Court will address the merits of the remaining claims presented on direct review. *See* 28 U.S.C. §§ 2254(b)(2).

## B. Claims Found Barred on State Habeas Review

The Supreme Court of Virginia found Claims 2, 6, 7, and 8 barred by *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974), because they could have been, but were not, raised on appeal. State Hab. Op. 12-13. *Slayton* is an adequate and independent state procedural rule. *See Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997). Thus, Claims 2, 6, 7, and 8 are barred unless Petitioner can show cause and prejudice. Petitioner argues that counsel rendered ineffective

assistance in failing to bring these claims on direct appeal. As discussed below, counsel's failure to raise these claims was not ineffective. Claims 2, 6, 7, and 8 will be DISMISSED.

## C.    Claims Presented for the First Time on Federal Habeas Review

In Claim 9(b), Petitioner claims that appellate counsel failed to timely inform him that his petition for rehearing had been rejected. Petitioner did not raise the factual basis for this claim in his state habeas petition. If Petitioner were to file a habeas petition now, the Supreme Court of Virginia would find it procedurally barred under Section 8.01-654(B)(2) of the Virginia Code because the underlying facts were available when he filed his first petition. *See Barnes v. Thompson*, 58 F.3d 971, 977 n.6 (4th Cir. 1995) (explaining that Virginia law bars claims based on facts which "the petitioner either knew or had available" when the first petition was filed) (*citing Stockton v. Murray*, 41 F.3d 920, 925 (4th Cir. 1994); *Waye v. Murray*, 884 F.2d 765, 766 (4th Cir. 1989). Section 8.01-654(B)(2) is an adequate and independent state ground. *See Gray v. Netherland*, 518 U.S. 152, 162 (1996). Claim 9(b) will be DISMISSED.

In Claim 10, Petitioner argues that the Commonwealth's Attorney tampered with the witnesses by mailing their 1996 witness statements directly to them for review in the course of preparing for trial. Respondent argues that these claims are procedurally defaulted because they were never raised in state court. Petitioner claims, however, that he discovered the factual basis for this claim on April 5, 2009. Petitioner reasons that the "factual predicate" of this claim therefore "could not have been previously discovered through due diligence" because he was not present at the hearing at which the Commonwealth admitted sending the statements. (Petr. Opp'n Mot. to Dismiss 6.) Petitioner's state habeas petition, however, contains a citation to the transcript of the September 28, 2004 hearings. (Br. Supp. State Hab. Pet. 32.) Petitioner thus fails to show that these facts were unavailable. Claim 10 will be DISMISSED.

## IV. APPLICABLE CONSTRAINTS ON HABEAS REVIEW

Federal law circumscribes this Court's power to grant habeas relief. 28 U.S.C.

§ 2254(e)(1) provides that "[s]tate court factual determinations are presumed to be correct and

may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th

Cir. 2008) (*citing* 28 U.S.C. § 2254(e)(1)), *cert. denied* 129 S. Ct. 1579 (2009). Under 28 U.S.C.

§ 2254(d), a federal court may not grant relief on any claim that was adjudicated on the merits in

state court unless the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is an "unreasonable application" of Supreme Court law if "the

state court correctly identifies the governing legal principle . . . but unreasonably applies it to the

facts of the particular case." *Bell v. Cone,* 535 U.S. 685, 694 (2002) (*citing Williams v. Taylor*,

529 U.S. 362, 407-08 (2000)). Demonstrating unreasonableness requires "a substantially higher

threshold" showing than mere error. *Schriro v. Landigran*, 550 U.S. 465, 473 (2007) (*citing*

*Williams*, 529 U.S. at 410). Moreover, "courts are to review the result that the state court reached,

not whether [its decision] [was] well reasoned." *Larry v. Branker*, 552 F.3d 356, 365 (4th Cir.)

(alterations in original; internal quotations omitted), *cert. denied*, 130 S. Ct. 408 (2009).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel are governed by the standard articulated by the

Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). First, Petitioner must prove

that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

The review of counsel's performance is highly deferential, indulging "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007) (*quoting Strickland*, 466 U.S. at 689). "The defendant (or petitioner) bears the burden of overcoming this presumption." *Id.*

Second, Petitioner must show that counsel's deficient performance actually prejudiced his defense to the extent that there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Glover v. Miro*, 262 F.3d 268, 275 (4th Cir. 2001) (*citing Strickland*, 466 U.S. at 694). Absent a showing of prejudice, the court need not consider deficiency. *Strickland*, 466 U.S. at 697.

It is worthwhile to observe, before turning to the merits of Petitioner's claims, that this was not a close case. Petitioner's version of events was riddled with inconsistencies, and his defense was only that the Navy had orchestrated a massive conspiracy to cover up sexual misconduct by its officers. Moreover, by deciding to take the witness stand and testify that other witnesses had lied, Petitioner made his own credibility the key factor in his trial. Even a dry reading of the transcript makes apparent Petitioner's lack of credibility. Petitioner therefore faces extreme difficulty in establishing any actual prejudice.

## A.    Claims Relating to the Performance of Attorneys Miller and Legler

### 1.    Claim 1(A)(i):  Continuance of Trial Date

On state habeas review, the Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because Petitioner failed to present any evidence to rebut counsel's affidavits averring that they "advised [P]etitioner of the need for each continuance they sought due to the complex nature of the case, and [P]etitioner concurred with their decisions."

State Hab. Op. 2. Petitioner has failed to rebut with clear and convincing evidence the presumption that this factual finding was correct. Additionally, Petitioner does not explain how any continuance prejudiced him. Accordingly, Claim 1(A)(i) will be DISMISSED.

### 2.    Claim 1(A)(ii): Failure to Communicate

The Supreme Court of Virginia rejected this claim because the record demonstrated numerous meetings, and Petitioner failed to "articulate what counsel failed to communicate to [P]etitioner or what information he would have given counsel had they communicated more frequently." State Hab. Op. 2. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. *See Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced.") (*citing Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990)). Claim 1(A)(ii) will be DISMISSED.

### 3.    Claim 1(A)(iii): Failure to Appear at the March 8, 2004 Hearing

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because the hearing "concerned a news agency's motion to quash the Commonwealth's subpoena" and "[P]etitioner fail[ed] to articulate why counsel needed to be present at this hearing or how their absence prejudiced [P]etitioner." State Hab. Op. 3. The Supreme Court of Virginia's decision was not unreasonable. Indeed, the Circuit Court provisionally granted the television station's motion to quash at this hearing. Claim 1(A)(iii) will be DISMISSED.

### 4.    Claim 1(A)(iv): Withdrawal of Counsel Seven Days Prior to Trial

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because the record showed that "counsel were forced to withdraw because the

29

Commonwealth decided to use counsel's former and current clients as witnesses in [P]etitioner's case," and because Petitioner did not "articulate how the change in counsel affected the proceedings." State Hab. Op. 3. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(A)(iv) will be DISMISSED.

**B.    Claims Relating to the Performance of Attorney Reed**

**1.    Claim 1(B)(i):  Failure to Investigate**

The Supreme Court of Virginia rejected this claim because Miller and Legler had already performed the bulk of the necessary investigation, and "[P]etitioner fail[ed] to articulate what additional investigation he contends Reed should have conducted or what information such an investigation would have revealed." State Hab. Op. 4. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(i) will be DISMISSED.

**2.    Claim 1(B)(ii):  Failure to Make Motions to Admit Evidence**

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because Petitioner "fail[ed] to identify the evidence he contends counsel should have moved to admit at trial." State Hab. Op. 5. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(ii) will be DISMISSED.

**3.    Claim 1(B)(iii):  Failure to Adequately Meet with Petitioner**

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because Petitioner "fail[ed] to articulate why additional meetings with Reed were

necessary and fail[ed] to identify what information Reed would have discovered had he and [P]etitioner met more often." State Hab. Op. 5. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(iii) will be DISMISSED.

### 4. Claim 1(B)(iv): Failure to Subpoena Witnesses

The Supreme Court of Virginia rejected this claim because "[a]lthough the [P]etitioner presents investigative reports and memoranda in support of this claim, [P]etitioner fails to proffer precisely what testimony these witnesses would have provided and fails to present any affidavits to verify the witnesses would have testified favorably to the defense." State Hab. Op. 6-7. Courts "are reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses." *Lenz v. True*, 370 F. Supp. 2d 446, 479 (W.D. Va. 2005) (*citing Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). The United States Court of Appeals for the Fifth Circuit has held that a petitioner cannot demonstrate prejudice unless he demonstrates "'not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (alteration in original) (*quoting Alexander*, 775 F.2d at 602). Petitioner has not offered any evidence that the witnesses would have testified at trial. Thus, the Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law as determined by the Supreme Court, and was not based on an unreasonable determination of the facts. Claim 1(B)(iv) will be DISMISSED.

### 5. Claim 1(B)(v): Lying About Failure to Subpoena Witnesses

Petitioner does not argue, nor does the record show, that he was prejudiced by counsel's alleged lie. Claim 1(B)(v) will be DISMISSED.

### 6. Claim 1(B)(vi): Failure to Adequately Cross-examine Mentzer

Petitioner claims that Mentzer faced second degree murder charges unless he told police that Petitioner owned a knife. Petitioner claims that "if the jury [had known] that [Mentzer] was given immunity from prosecution, [Petitioner] could have been found innocent," because the Commonwealth's case "almost entirely depended" on Mentzer's testimony. (Br. Supp. Pet. 5-6.)

Mentzer's testimony was actually of little consequence. Mentzer testified that Petitioner once "proceeded to show us what he got" from a gun show, including a "virgin" knife. (Trial Tr. 1277-78.) Petitioner intended to keep the knife unused so that, if a burglar ever broke into his apartment, he could shoot the burglar and then plant the knife on the body as justification. (Trial Tr. 1278.) On cross-examination, Mentzer admitted that he told police investigating Elise's death that he had never known Petitioner to carry a knife. (Trial Tr. 1280-81.) Mentzer testified that he did not recognize an exact replica of the knife, but that he did recognize the style "[b]ecause it was in a plastic bag. . . . I didn't see any - - you know, so what. You know, it's a knife in a plastic bag." (Trial Tr. 1278.) Thus, Mentzer did not appear to identify the "virgin" knife as the murder weapon. Moreover, Detective Yoakam testified that it was "made specifically for Kmart stores to be sold in Kmart stores solely." (Trial Tr. 968.) Finally, many other witnesses testified that Petitioner had a collection of guns and knives. In light of the extensive evidence presented against Petitioner, he has not demonstrated counsel's failure to pursue an opportunity to further impeach Mentzer on this matter resulted in any prejudice. Claim 1(B)(vi) will be DISMISSED.

7.    **Claim 1(B)(vii): Failure to Object to Dunton's Perjury and Evidence Tampering**

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because:

> Petitioner proffer[ed] no evidence to establish that the blood in question belonged to petitioner. The record, including the trial transcript, demonstrate[d] that counsel questioned Wakeman, who testified that Mrs. Makdessi was transported directly from the bedroom to the ambulance and that Wakeman did not know if Mrs. Makdessi bled on the carpet while she was being transported. . . .
> . . .
> Petitioner identifie[d] no act or omission by counsel and proffers no evidence that the blood found on the carpet was sampled or tested. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

State Hab. Op. 9-10. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(vii) will be DISMISSED.

8.    **Claim 1(B)(viii): Failure to Object to Gardner's Testimony that Petitioner Had No Blood on His Hands**

The Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because "Gardner did not testify that petitioner did not have blood on his hands. Instead, Gardner testified that the pictures taken of petitioner's hands at the hospital did not show blood on the petitioner's hands, leading Gardner to conclude that by the time the picture was taken, petitioner had washed his hands." State Hab. Op. 10. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(viii) will be DISMISSED.

### 9. Claim 1(B)(ix): Failure to Object to the Introduction of the "Unbelievable True Story"

The Supreme Court of Virginia rejected this claim because of the evidence that the email was sent through Petitioner's account, and because Petitioner failed to articulate any basis for objecting. State Hab. Op. 11. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. *See Call v. Polk*, 454 F. Supp. 2d 475, 499 (W.D.N.C. 2006) ("When a habeas petitioner claims that counsel was ineffective without explaining in what manner the performance was lacking, the reviewing court is not obliged to supply the grounds for relief."). Claim 1(B)(ix) will be DISMISSED.

### 10. Claim 1(B)(x): Failure to Object to the Prosecutor's Statement During Closing Arguments that Elise Was Shot

On state habeas review, the Supreme Court of Virginia found that Petitioner demonstrated neither deficiency nor prejudice because "[t]he record, including the trial transcript, demonstrates that ample evidence was presented to establish that petitioner's wife had been stabbed to death. Petitioner fails to demonstrate how he was prejudiced by the prosecutor's single misstatement that Mrs. Makdessi was 'shot' as opposed to having been stabbed multiple times." State Hab. Op. 11-12. The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 1(B)(x) will be DISMISSED.

### C. Claims Relating to the Performance of Appellate Counsel

The state habeas court found that Claim 9 lacked merit because:

> The record, including the affidavit of appellate counsel, demonstrates that counsel met with petitioner on two occasions and discussed each issue petitioner desired to raise on appeal. After consulting with petitioner, petitioner and counsel agreed that they would raise petitioner's strongest constitutional claims concerning the suppression of the wife's videotape and confession and petitioner's inability to access the law library. The selection of issues to address on appeal is left to the discretion of appellate counsel, and counsel need not address every possible issue on appeal. Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

State Hab. Op. at 14. Petitioner has failed to rebut the Supreme Court of Virginia's findings with clear and convincing evidence.[10] Petitioner has also failed to argue, much less demonstrate, that the omitted claims are "clearly stronger" than those presented on direct appeal. *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (*quoting Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Claim 9 will be DISMISSED.

## VI. RIGHT TO SELF-REPRESENTATION

In Claim 3(A) and Claim 5, Petitioner claims that the Circuit Court violated his right to self-representation by denying him meaningful access to a law library. The Virginia Court of Appeals held that this claim was without merit because Petitioner could have been represented by appointed counsel, but refused, and therefore had no constitutional right to any access to a law library. App. Ct. Op. 11 (*citing United States v. Chatman*, 584 F.2d 1358, 1360 (4th Cir. 1978)).

---

[10] Petitioner has attached as an exhibit a handwritten letter purportedly sent to appellate counsel on June 5, 2006, wherein he writes that the six grounds constitute "a few of the more colorful reasons" that he "should get [his] appeal," and that the grounds designated here as 1, 2, and 3 "for sure. . . should be part of the appeal." (Pet. Ex. 14, at 1.) Petitioner also attaches a letter from appellate counsel dated August 3, 2007, in which counsel refers to having received a letter of June 5, 2007. (Pet. Ex. 14, at 2.) This evidence, which was not submitted on state habeas review, is neither clear nor convincing, and does not rebut the state court's finding that Petitioner agreed with counsel's selection of claims on appeal.

The Supreme Court of Virginia's decision was not contrary to or unreasonable in light of clearly established federal law, and was not based on an unreasonable determination of the facts. Claim 3(A) and Claim 5 will be DISMISSED.

In Claim 3(B), Petitioner claims the Circuit Court did not allow him to represent himself effectively. Petitioner claims that, if he had not been interrupted by the Circuit Court, "[he] would have pointed out to the court that [Elise] is pointing the finger at Quincy Brown in the videotape." (Br. Supp. Pet. 32.) Petitioner then would have introduced evidence that the videotape was created no more than eleven days before the murder, and asked the Court to play the videotape on the record. (Br. Supp. Pet. 33.) Finally, Petitioner would have introduced statements made to the police by the witnesses referred to in Claim 1(B)(iv). (Br. Supp. Pet. 33-34.)

Petitioner's claim is not factually supported. At the time Petitioner claims he was "cut off," the time to proffer evidence regarding the contents of the videotape had passed because the Circuit Court had already ruled that it was inadmissible hearsay after hearing Petitioner's arguments.[11] (Br. in Supp. of Pet. 31-32 (*quoting* Jan. 12, 2005 Tr. 9).) Additionally, the transcript does not show that Petitioner ever began to proffer the contents of the videotape into evidence. Moreover, Petitioner fails to cogently argue or cite any authority for the extraordinary proposition that the Circuit Court's evidentiary rulings rise to the level of constitutional violations merely because Petitioner was not represented by counsel at the January 12, 2005 hearing. *See Rock v. Arkansas*, 483 U.S. 44, 55 n.11 (1987) (observing that "[n]umerous state procedural and

---

[11] The Circuit Court explicitly reserved for trial any ruling on whether Petitioner's witnesses could testify as to Elise's statements or the existence of the videotape. (Jan. 12, 2005 Tr. 10.)

evidentiary rules control the presentation of evidence and do not offend the defendant's right to testify"); *United States v. Lancaster*, 96 F.3d 734, 744 (4th Cir. 1996) (rejecting proposition that Sixth Amendment right to compulsory process "encompasses the right to present any evidence the defense wishes, regardless of its admissibility under the Federal Rules of Evidence"). Claim 3(B) will be DISMISSED.

The Petition will be DENIED. Petitioner's Motion for an Evidentiary Hearing (Docket No. 16) will be DISMISSED AS MOOT. The action will be DISMISSED.

An appropriate Order shall issue.

/s/
Richard L. Williams
United States District Judge

Richmond, Virginia
Date: FEB 0 4 2010